[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13561

_____

D.C. Docket No. 2:14-cv-01014-SRW

REPRODUCTIVE HEALTH SERVICES,
on behalf of its patients, physicians and staff,
JUNE AYERS,
RN,

Plaintiffs - Appellees,

versus

LUTHER STRANGE,
in his official capacity as Attorney General of the State of Alabama,

Defendant,

DARYL D. BAILEY,
in his official capacity as District Attorney of Montgomery County, Alabama,
STEVE T. MARSHALL,
in his official capacity as Attorney General of the State of Alabama,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(June 30, 2021)

Before WILSON, JORDAN, and HIGGINBOTHAM,[*] Circuit Judges.

PER CURIAM:

This appeal concerns a set of amendments to Alabama's Parental Consent Act, Ala. Code § 26-21-4, which regulates an unemancipated minor's ability to obtain an abortion. After the amendments were enacted in 2014, Reproductive Health Services (RHS), an abortion facility in Montgomery, Alabama, and June Ayers, its administrator and owner, challenged some of the Act's amended provisions in a suit against the Attorney General of Alabama and the District Attorney of Montgomery County.

The district court, ruling on cross-motions for judgment on the pleadings, held that some of the challenged provisions were unconstitutional, severed those provisions from the rest of the Act, and entered a declaratory judgment that rendered the severed provisions unenforceable.

_____

[*] The Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

The Attorney General and the District Attorney argue on appeal that RHS's claims are non-justiciable and that the provisions struck down by the district court are constitutional.  With the benefit of oral argument, we affirm.[1]

## I.    ALABAMA'S PARENTAL CONSENT ACT

Alabama's Parental Consent Act, Ala. Code § 26-21-1 et seq., requires a physician to obtain the written consent of one parent or guardian before performing an abortion on an unemancipated minor.  *See* § 26-21-3(a).  Alternatively—and as required by the Supreme Court, *see, e.g.*, *Bellotti v. Baird* (*Bellotti II*), 443 U.S. 622, 647 (1979) (plurality opinion)—a minor may seek a judicial order authorizing the procedure if she can establish that she is "mature and well-informed enough to make the abortion decision on her own," or that the abortion would be in her "best

---

[1] We heard oral argument in this case in April of 2018.  But in May of 2019 Alabama enacted the Human Life Protection Act, which imposed criminal liability on abortion providers for all attempted and completed abortions except for those performed "to prevent a serious health risk" to the mother.  *See, e.g.*, Ala. Code § 26-23H-4(a)-(b).  The Human Life Protection Act repealed, as null and void, any Alabama laws that were in conflict with its provisions but left those other laws in place if the Act was preliminarily enjoined.  *See* Ala. Code § 26-23H-8.  If upheld, the Human Life Protection Act would have rendered this case moot in many respects by declaring null and void several of the challenged provisions in Alabama's Parental Consent Act.

In October of 2019, a federal district court declared the Human Life Protection Act unconstitutional, and preliminarily enjoined its enforcement, with respect to pre-viability abortions.  *See Robinson v. Marshall*, 415 F. Supp. 3d 1053, 1060 (M.D. Ala. 2019).  That decision, by operation of § 26-23H-8, kept in place Alabama's Parental Consent Act and eliminated any mootness concerns.

We also decided to await decisions by the full Eleventh Circuit in *Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019) (en banc), which involved a number of justiciability issues in a 42 U.S.C. § 1983 suit against the Alabama Attorney General, and by the Supreme Court in *June Medical Services v. Russo*, 140 S. Ct. 2103 (2020), which involved a challenge to a Louisiana abortion statute similar to the law at issue in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).  Those cases were decided, respectively, in December of 2019 and June of 2020.

interest."[2]  Ala. Code § 26-21-4(g).  The burden is on the minor to prove that she meets one or both statutory criteria, and courts are instructed to consider the "totality of the evidence."  § 26-21-4(h).

The 2014 amendments changed the process by which a minor may obtain a judicial order to bypass the parental-consent requirement, transforming it from a proceeding that was designed to be more of an avuncular visit in chambers with the judge than an open court, call-your-first-witness affair. The state legislature, in amending the Act, explained that Alabama's interest is "to not only . . . protect the rights of the minor mother, but also to protect the state's public policy to protect unborn life."  § 26-21-1(d).

The Act mandates that all proceedings "shall be confidential and anonymous," and requires that the minor "be identified by initials only" in all pleadings.  § 26-21-4(o).  But that assurance of confidentiality is undermined by another provision, § 26-21-4(c), which provides that the minor's identity may be disclosed not only to the court, to a guardian ad litem, or to court personnel, but also to the District Attorney, and to any other witness or person who has a need to know.

Another provision of the Act says "[n]otice by the court to the minor's parents, parent, or legal guardian shall not be required or permitted."  § 26-21-4(a).  But § 26-

---

[2] Although this opinion uses gendered terms, we recognize that not all persons who may become pregnant identify as female.

4

21-4(*l*) instructs that if the minor's parents or guardian are "otherwise aware" of the bypass proceeding, they "shall be given notice of and be permitted to participate in the proceeding and be represented by counsel with all of the rights and obligations of any party to the proceeding."

When a minor files a judicial-bypass petition, the Act requires the court to "immediately notify the district attorney's office of the county in which the minor is a resident, or the county where the petition was filed." § 26-21-4(i). The District Attorney "shall participate as an advocate for the state to examine the [minor] and any witnesses, and to present evidence for the purpose of providing the court with a sufficient record upon which to make an informed decision and to do substantial justice." *Id.* The District Attorney may request the court for additional time "to obtain evidence, subpoena witnesses, or to obtain and present any evidence or information which will be necessary and appropriate for the court to make an informed decision." § 26-21-4(k). Such a delay shall not exceed one business day, "unless justice requires an extension thereof." *Id.* The District Attorney can file an appeal from the bypass court's decision. § 26-21-4(n).

The court, in its discretion, "may appoint" a guardian ad litem to represent "the interests of the unborn child" in the minor's judicial-bypass proceeding. § 26-21-4(j). Such a guardian "shall" have the same rights and obligations of participation in the proceeding as given to the District Attorney. *Id.*

The guardian ad litem for the fetus and the parents or guardians of the minor may cross-examine the minor and any other witnesses. § 26-21-4(i), (j), (l). They are also allowed to subpoena witnesses to testify at the bypass hearing. § 26-21-4(f), (k). And they (along with anyone else involved in the proceeding) can request to extend the 48-hour period for a ruling on a bypass petition in order to obtain further testimony or evidence necessary for the court "to make an informed decision and to do substantial justice." § 26-21-4(e). "[A]ny such delay shall not be more than one business day . . . unless justice requires an extension thereof." § 26-21-4(k). There appear to be no limits on what justice may "require[]" in terms of an extension.

A minor can appeal a court's decision denying her bypass petition. § 26-21-4(n). The District Attorney, the guardian ad litem for the fetus, and the minor's parents or guardians may also appeal a decision granting a minor's bypass petition. *Id.* The appeal must be perfected and the record prepared within five days from the filing of the notice of appeal. *Id.*

"Any person who intentionally performs or causes to be performed an abortion in violation of" the Act, or who "intentionally fails to conform to any requirement" of the Act, "shall be guilty of a Class A misdemeanor." § 26-21-6(a)(1). A conviction for a Class A misdemeanor is punishable by a term of imprisonment of up to one year and a fine of up to $6,000. §§ 13A-5-7(a)(1), 13A-5-12(a)(1). A violation may also "result in the suspension of the person's

6

professional license for a period of at least one year," and failure to comply "provide[s] a basis for professional disciplinary action . . . for the suspension or revocation of any license of physicians, psychologists, licensed social workers, licensed professional counselors, registered nurses, or other licensed or regulated persons." § 26-21-6(a)(2), (b).

## II.     THE PLAINTIFFS' COMPLAINT AND THE DEFENDANTS' ANSWER

RHS offers reproductive health services to women in Alabama and neighboring states. As the only licensed abortion facility in Montgomery, Alabama, it provides abortion services to adults and minors, including minors who judicially bypass the parental-consent requirement. Ayers, a registered nurse, has been the owner and administrator of RHS for the past 30 years.

The plaintiffs' complaint contains several factual allegations and four legal claims.

### A. THE PLAINTIFFS' FACTUAL ALLEGATIONS

RHS and Ayers asserted that abortion is one of the safest medical procedures in the United States for both adult women and minors. The rate of complications from abortion is extremely low—less than 0.3% of abortion patients have complications requiring hospitalization, and minors have lower rates of complication than adult women. RHS's rate of complications is even lower. Still, the risks of an abortion increase as pregnancy progresses into the second trimester.

7

Most minors who seek an abortion inform at least one parent of that decision. The younger the minor, the more likely she will be to involve a parent in her decision to obtain an abortion. When a minor does not involve a parent in her decision to terminate her pregnancy, she generally has compelling reasons, including the fear of violence, being asked to leave home, being disowned, or being forced to carry an unwanted pregnancy to term.

For minors who seek a judicial bypass, confidentiality is essential—and any breach of confidentiality can cause harm, given the intensely private nature of the decision to terminate a pregnancy. When minors cannot be certain that the judicial-bypass system will guarantee their confidentiality, some will go to extreme lengths—including obtaining an illegal abortion or self-inducing an abortion—for fear of retribution if they were to end their pregnancy.

Going to court can be intimidating for minors in any setting, but that is particularly true for minors who seek judicial authorization for an abortion, which requires placing in the government's hands a decision that will change the course of one's life forever. These fears are heightened, RHS says, by the 2014 amendments—which allow adverse parties (including prosecutors) to participate and to cross-examine minors about their personal lives, their sexual experiences, and their decision to seek to terminate their pregnancy. Because any of the adverse parties can subpoena witnesses to testify, minors also will not know who else might

8

appear and participate at a bypass proceeding. The people who tend to have relevant information about a minor's maturity and her best interest often include teachers, relatives, coaches, friends, neighbors, and employers. And those are precisely the types of people the minor might not want to involve in such an intimately personal decision.

RHS argues that the 2014 amendments fail to assure a minor that the bypass hearing and any appeals that follow will be conducted in a way that satisfactorily preserves her confidentiality and provides her with an effective and expeditious mechanism to seek a waiver of the parental consent requirement, even if she is mature and the abortion is in her best interest. This, RHS urges, makes the option of a bypass proceeding a Hobson's choice, given the potential harm associated with seeking court approval.

RHS further argues that the 2014 amendments create a bypass procedure that is not expeditious. The bypass proceeding can be delayed by adverse parties' unprecedented right to adjourn proceedings to obtain additional evidence. Adverse parties also have the right to appeal, which can delay the process by as long as a month. These delays can prevent some minors from obtaining an abortion; RHS performs abortions only up to 14 weeks from the woman's last menstrual period, and most of its minor patients cannot feasibly travel to a provider that performs abortions later in gestation. The next closest provider of abortions after 14 weeks is

9

in Tuscaloosa, over 100 miles away.  Even for minors who can make the trip, the delays imposed by the 2014 amendments will increase the medical risks of the procedure.

## B.  THE PLAINTIFFS' CLAIMS

In their complaint, RHS and Ayers asserted four legal claims. Count I (Substantive Due Process) alleges that the amended provisions violate their patients' rights to liberty and privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment, by failing to provide an adequate judicial bypass to the parental consent requirement.  Count II (Substantive Due Process) alleges that the provisions violate their patients' Fourteenth Amendment rights by permitting adverse parties and the court to disclose intimately personal information about the minor to others, including potential witnesses.  Count III (Right to Travel) alleges that limiting access to judicial bypass to only Alabama residents violates the fundamental right of out-of-state minors to travel under the Privileges and Immunities Clause of the United States Constitution by impairing the right of these minors to travel to Alabama to obtain abortion services.  Count IV (Equal Protection) alleges that limiting access to judicial bypass to only Alabama residents violates the right of out-of-state minors to equal protection as guaranteed by the Fourteenth Amendment.  Minors are treated differently based on their state of residence and

whether they have traveled into Alabama to obtain an abortion, thereby creating classifications that penalize the exercise of the fundamental right to interstate travel.

## C. THE DEFENDANTS' ANSWER

In their answer, the Attorney General and the District Attorney denied all the factual allegations relating to the Act and its effects. The denials were generally either one-word denials or denials based on lack of sufficient information.

The defendants also denied each of Counts I through IV. They incorporated their factual denials and separately denied the four legal claims made by the plaintiffs. The defendants asserted affirmative defenses, but they did not provide any factual or legal details for them (e.g., "Some or all of the Plaintiffs' claims are barred by the Eleventh Amendment.").

## III.   THE DISTRICT COURT'S ORDER

After the district court denied the defendants' motion to dismiss, *see Reprod. Health Servs. v. Strange* (*RHS I*), 204 F. Supp. 3d 1300 (M.D. Ala. 2016), the parties filed cross-motions for judgment on the pleadings. The district court granted each side's motion in part, explaining that the parties were seeking a declaratory judgment on the constitutionality of certain provisions of the Act. *See Reprod. Health Servs. v. Marshall* (*RHS II*), 268 F. Supp. 3d 1261 (M.D. Ala. 2017).

11

First, the district court ruled that certain amendments to the Act were facially unconstitutional under the undue burden standard. The provisions declared unconstitutional were:

(1) § 26-21-4(i), which requires the bypass court to immediately notify the District Attorney when a bypass petition is filed, and provides that the District Attorney shall participate as an advocate for the state to examine the minor and any witnesses and to present evidence;

(2) § 26-21-4(j), which allows a bypass court to appoint a guardian ad litem for the interests of the unborn child and gives that guardian the same rights of participation as the District Attorney;

(3) § 26-21-4(*l*), which allows parents and legal guardians who are otherwise aware of the judicial-bypass proceeding to participate as parties;

(4) portions of § 26-21-4(c) that permit the identity of the minor to be disclosed to any guardian ad litem, a representative for the District Attorney, any witness with a need to know, or any other person whom the bypass court determines has a need to know;

(5) § 26-21-4(f), to the extent that the bypass court has the authority to issue subpoenas and to permit any party in the proceeding to submit evidence in support of or against the minor's petition;

(6) § 26-21-4(k) to the extent it permits any party to the bypass proceeding other than the minor to obtain evidence and subpoena witnesses; and

(7) § 26-21-4(e) and (n) to the extent they permit parties other than the minor to take actions related to the bypass proceeding.

The district court severed these provisions, which were made unenforceable, it said, by its entry of default judgment. Accordingly, the district court concluded that the claims for injunctive relief were moot. *See RHS II*, 268 F. Supp. 3d at 1275–88, 1294–97. The district court then dismissed on mootness grounds the claims concerning information privacy and out-of-state minors.

## IV.    JUSTICIABILITY: STANDING

The Attorney General and the District Attorney argue that, but for one provision, the plaintiffs' claims should be dismissed on standing and Eleventh Amendment sovereign immunity grounds. In their view, only § 26-21-4(i)—which requires notice of newly filed petitions to the District Attorney and mandates his participation in the bypass proceeding as an advocate for the state—survives to the merits.

Before we address the merits, we confront the threshold questions of standing and Eleventh Amendment sovereign immunity because they implicate our subject-matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94

(1998); *Seaborn v. State of Fla., Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998).  We begin with standing.

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies," and "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks omitted).  A plaintiff must show (1) it has suffered an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) likely to be redressed by a decision in the plaintiff's favor.  *See id.* at 1547 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  On a motion to dismiss or, as here, a motion for judgment on the pleadings, "we must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations." *Steel Co.*, 523 U.S. at 104.

## A. INJURY IN FACT

Injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations, footnote, and internal quotation marks omitted).  The plaintiffs' complaint identifies two concrete injuries: (1) the risk of criminal prosecution and civil penalties for performing abortions in violation of the Act, and (2) the lost revenues that would result from the Act's chilling effect

14

on minor's seeking abortions. The plaintiffs also identified third-party standing through harm to the patients.

Anyone who performs an abortion or causes an abortion to be performed in violation of the Act is subject to prosecution for a Class A misdemeanor, § 26-21-6(a)(1), and faces potential suspension and revocation of professional licenses for failure to comply with the Act, § 26-21-6(b). The threat of prosecution and loss of medical license is a sufficient injury for Article III standing. *See Planned Parenthood Ass'n of Atlanta Area, Inc. v. Miller*, 934 F.2d 1462, 1465 n.2 (11th Cir. 1991) (when a minor's "physician faces criminal penalties if he violates [a challenged abortion statute], . . . he suffers sufficient threat of injury in fact to satisfy the constitutional standing requirement"); *see also Diamond v. Charles*, 476 U.S. 54, 65 (1986) ("A physician has standing to challenge an abortion law that poses for him a threat of criminal prosecution.").

The plaintiffs need not "await the consummation of threatened injury to obtain preventive relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). When statutes or regulations provide that "certain disciplinary sanctions 'shall' be imposed for violations . . . , [that] is enough to show a credible threat of enforcement." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc) (citation omitted). As the Supreme Court has said, "[o]ur cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms

15

they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

The plaintiffs' second injury is loss of revenue: the Act will deter some minors from seeking a judicial bypass entirely, and it will delay others beyond the gestational period during which RHS can perform abortions. "[W]hen the legislation inflicts direct economic harm on the physician, he suffers concrete injury." *Miller*, 934 F.2d at 1465 n.2; *see also Singleton v. Wulff*, 428 U.S. 106, 113 (1976) (physicians satisfied Article III's injury-in-fact requirement because the challenged statute barred payments that they otherwise would have received for non-therapeutic abortions). We therefore conclude that the plaintiffs have satisfied the injury-in-fact requirement.

### B. CAUSATION AND REDRESSABILITY

These two prongs are intertwined, so we discuss them together. "To satisfy Article III's causation requirement, the named plaintiffs must allege that their injuries are 'connect[ed] with the conduct of which [they] complain." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (alterations in original) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). This requires "no more than a showing that there is a substantial likelihood of causation." *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 75 n.20 (1978). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for

standing purposes." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

The plaintiffs' injuries are traceable to the Attorney General and the District Attorney. The Act contemplates enforcement by the Attorney General and the District Attorney through its criminal-sanctions provision. This power provides the requisite traceability for standing.

The redressability prong "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis omitted). Here, the relief that the plaintiffs seek—a declaration that some of the bypass provisions are unconstitutional—directly redresses their injuries. The entry of such a judgment would preclude the Attorney General and the District Attorney from enforcing the unconstitutional provisions. If the plaintiffs can continue to perform safe and lawful abortions without fear of prosecution, and if potential minor patients can then seek abortions without navigating an unconstitutional bypass procedure, the plaintiffs will not lose patients who may choose to forego the abortion under the unconstitutional scheme or might be unable to obtain an order of waiver through the bypass court. Accordingly, we find that the plaintiffs have satisfied the causation and redressability requirements for Article III standing.

17

We are unpersuaded by the defendants' arguments to the contrary. The Attorney General and the District Attorney argue that the challenged bypass scheme principally deals with judicial procedures, the implementation of which is delegated to bypass judges. The general rule is that it should be the effect of the court's judgment on the defendant, not on an absent third party, that redresses the injury. *See Lewis v. Governor of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (finding no redressability where named defendants were state officials and statute created only a private cause of action). But there is redressability where "it is substantially likely" "as a practical matter" that non-parties "would abide by an authoritative interpretation" of the law, even if such parties "would not be directly bound by such a determination." *Utah v. Evans*, 536 U.S. 452, 460 (2002); *see also Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion).

In *Franklin* and *Evans*, the Supreme Court found redressability where the named defendant in challenges to a census statute was the Secretary of Commerce, but third parties' actions played a role in the Court's determinations. In those cases, redressability depended in part on "other executive and congressional officials"—including the President himself, who is not bound to follow the recommendations of his subordinates—abiding by the Court's "authoritative interpretation of the [] statute and [relevant] constitutional provision." *Franklin*, 505 U.S. at 803 (plurality opinion); *see also Evans*, 536 U.S. at 460.

18

More recently, in *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), a panel majority found no redressability in a challenge to a ballot order statute. There, the named defendant was the Secretary of State, but county election supervisors were tasked with enforcing the law. *Id.* at 1236. The panel said the plaintiffs had not established "that redress is likely as a practical matter," because they had "not proved that declaratory relief against the Secretary will significantly increase the likelihood that the Supervisors will ignore state law and follow a federal decree that does not bind them." *Id.* at 1255 (citing *Evans*, 536 U.S. at 461; *Lewis*, 944 F.3d at 1301) (internal quotation marks omitted). We do not have so dim a view of Alabama's judges.[3] While redressability might not have been "likely as a practical matter" in *Jacobson*, we find that it is here.

We are not concerned, for example, that Alabama judges will ignore a federal court's "authoritative interpretation," *Evans*, 536 U.S. at 460, of a state statute—at least insofar as that interpretation relates to whether the statute violates the United States Constitution. *See, e.g.*, U.S. Const. art. VI, cl. 2; *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) ("It is apparent that this

---

[3] Indeed, the Alabama courts are bound by a federal court's determination that a state statute violates the federal constitution. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 928 (1997) ("[S]tate courts cannot refuse to apply federal law—a conclusion mandated by the terms of the Supremacy Clause." (citing *Testa v. Katt*, 330 U.S. 386 (1947))).

19

Clause creates a rule of decision."). Indeed, state judges routinely follow "federal decree[s] that do[] not bind them" directly. *Jacobson*, 974 F.3d at 1255.

And even though the judges fulfill a discretionary role in the statutory scheme, that was likewise true of an absent party in *Franklin* and *Evans*. The President's role in the apportionment process challenged in those cases was not purely ministerial; he was "not expressly required to adhere to the policy decisions reflected in the Secretary's report." *Franklin*, 505 U.S. at 799 (plurality opinion). The Court still found the plaintiffs had standing to sue the Secretary of Commerce alone.

The Attorney General and the District Attorney further argue that some of the plaintiffs' injuries—those caused by the provisions allowing for the appointment of a guardian ad litem and the participation of parents and witnesses—are not redressable because other judicial rules in Alabama give the bypass courts the same authority. *See* Ala. R. Civ. P. 17(c) (authorizing courts to appoint guardians for "infant[s] unborn"); 24 (authorizing intervention of third parties); Ala. R. Evid. 614(a) (authorizing the calling of witnesses). To support this argument, they cite *Florida Family Policy Council v. Freeman*, 561 F.3d 1246, 1257 (11th Cir. 2009), where we held that a non-profit organization lacked Article III standing to challenge a Florida canon of judicial conduct because a separate Florida statute and a rule of judicial administration proscribed the same conduct.

20

But "Article III . . . does not demand that the redress sought by a plaintiff be complete." *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018). *Florida Family Policy* does not control the outcome here, because, unlike in that case, a favorable ruling for the plaintiffs would eliminate at least one of the alleged injuries to the plaintiffs—the threat of criminal penalties for violating the Act. There are no criminal penalties associated with Rule 17(c), so the unchallenged law will not continue to cause the same injury.

Moreover, the judicial canon before the court in *Florida Family Policy*—and the identical language in the Florida statute and the rule of judicial administration— functioned as standalone provisions governing the conduct of judges; the constitutionality of those provisions could be determined by considering any one of them, and the result would be the same across the board. The difference here is that appointing a guardian ad litem under Rule 17(c)—say, for an "infant unborn" at the center of a marital and associated custody dispute—might in some circumstances be constitutional; if it is, it is not necessarily true that appointing a guardian ad litem for a fetus in a bypass procedure, under § 26-21-4(j), is likewise constitutional. With respect to § 26-21-4(j), the alleged undue burden stems from the degree to which the guardian ad litem provision interferes with the bypass process; its role in the statutory scheme, more than anything else, gives rise to the argument that it is unconstitutional. In the same vein, the standards governing third-party intervention

21

under Rule 24, as well as the calling of witnesses under Rule 614(a), differ in substance from the provisions of the Parental Consent Act at issue in this case.

Finally, to the extent that the Attorney General and the District Attorney argue that the plaintiffs do not have third-party standing to assert the rights of their minor patients, they are mistaken. Their argument is foreclosed by a long (and unbroken) line of Supreme Court and Eleventh Circuit cases in the area of reproductive rights. Having established their own Article III standing, the plaintiffs can assert the rights of their minor patients who will allegedly be burdened by the Act. *See, e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682–84 (1977) (distributor of contraceptives had standing to assert the rights of its customers in a challenge to a law which limited the distribution of, and advertising for, contraceptives); *Diamond*, 476 U.S. at 65–66 ("[A] physician who demonstrates that abortion funding regulations have a direct financial impact on his practice may assert the constitutional rights of other individuals who are unable to assert those rights themselves."); *Singleton*, 428 U.S. at 113–17 (physician who performed abortions had standing to assert the rights of his patients in a challenge to a law which limited Medicaid benefits for certain abortion procedures); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 332–34 (5th Cir. Unit B Nov. 13, 1981) (abortion provider had standing to assert the rights of its patients in a challenge to the denial of an application for an occupational license to open an abortion facility); *Greco v. Orange Mem'l Hosp. Corp.*, 513 F.2d

873, 876 (5th Cir. 1975) (physician who performed abortions had standing to assert the rights of his patients in a challenge to a hospital's decision to prohibit elective abortions).

For these reasons, we find that the plaintiffs have Article III standing.

V.    JUSTICIABILITY: THE ELEVENTH AMENDMENT AND *EX PARTE YOUNG*

The Attorney General and the District Attorney have waived their immunity defense for one challenged provision: Ala. Code § 26-21-4(i).  But with respect to the remaining challenged provisions, the Attorney General and the District Attorney assert that they are entitled to sovereign immunity under the Eleventh Amendment. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  The Eleventh Amendment also bars suits against a state initiated by its own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 13–15 (1890).  The landmark case of *Ex parte Young*, 209 U.S. 123, 155–57 (1908), however, created an exception to this general rule of immunity.  The exception allows state officials to be sued in their official capacities by plaintiffs "seeking prospective equitable relief to end continuing violations of federal law." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) (emphases omitted).  Courts have understood *Ex parte Young*'s exception to

sovereign immunity to be based on the legal fiction that state officials act ultra vires "when they enforce state laws in derogation of the Constitution," and are therefore stripped of official immunity. *Id.* at 1336–37; *see also Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011) (explaining *Ex parte Young* as "rest[ing] on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes" (citation omitted)).[4]

For courts to enjoin enforcement of an allegedly unconstitutional law under *Ex parte Young*, the state-official defendant must have "some connection with the enforcement of the act." 209 U.S. at 157. Our decision in *Summit* illustrates the meaning of "some connection" in the Eleventh Circuit. In *Summit*, a group of abortion providers sued the Alabama attorney general and governor, seeking an injunction against the enforcement of what they claimed were unconstitutional partial-birth and post-vitality abortion statutes. *Id.* at 1329–31. The abortion providers specifically challenged provisions permitting criminal enforcement and private civil enforcement of the statute against abortion providers who did not abide by the statutory requirements. *Id.* The defendants claimed that the suit was barred

---

[4] *Ex parte Young* is perhaps best understood as a legal fiction because it creates the "'well-recognized irony' that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104–05 (1984).

by the Eleventh Amendment. *Id.* at 1329. With respect to the challenges against the criminal-liability provisions of the statutes, we disagreed, finding that the *Ex parte Young* exception to sovereign immunity applied. *Id.* at 1341. But we reached the opposite result when it came to the private civil-enforcement provisions. *Id.* at 1341–42. "Since neither the Governor, the Attorney General, nor the District Attorney—the only defendants in [that] case—ha[d] any relationship to the enforcement of [that] provision, we conclude[d] that the *Ex parte Young* doctrine d[id] not apply." *Id.* at 1342.

Thus if a state-official defendant can enforce an allegedly unconstitutional statute, the necessary *Ex parte Young* connection exists. *See, e.g.*, *Ex parte Young*, 209 U.S. at 157 (state attorney general was proper defendant because the challenged statute authorized him to criminally prosecute railroad companies that did not adopt statutorily required rates); *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988) (indigent persons charged with crimes alleged systemic deficiencies in the criminal-justice system violated constitutional rights, governor and state judges were proper defendants because they are responsible for law enforcement and executing laws faithfully).

The Attorney General and the District Attorney argue that the *Ex parte Young* exception is not applicable here because there is not "some connection" between the officials being sued and the enforcement of the challenged statute. That connection

25

is missing here, they say, because they do not structure bypass proceedings and have no control over how such proceedings are administered. That is true only in a limited sense. To be sure, the Attorney General and District Attorney cannot, for example, control whether or how a bypass court informs the minor's parents or appoints a guardian ad litem for the fetus. But under the Act's criminal-enforcement provision, Ala. Code § 26-21-6(a), they can criminally prosecute "[a]ny person who intentionally performs or causes to be performed an abortion in violation of the provisions of [the Act] or intentionally fails to conform to any requirement of [the Act]."[5] This is our *Ex parte Young* connection.

Consider the following example. A minor petitions for judicial bypass, and the bypass court abides by the judicial-bypass provisions and denies a bypass. The minor then seeks an abortion from a provider anyway. And, notwithstanding the absence of a judicial bypass, the abortion provider performs the abortion. The abortion provider has intentionally performed an abortion that violates or is not in compliance with the judicial-bypass provisions—and is now subject to criminal prosecution under the criminal-enforcement provision. If some of the enforced bypass provisions are unconstitutional and the Attorney General and District Attorney can initiate prosecution against the abortion provider because the minor

---

[5] Both the District Attorney and Attorney General are charged with enforcing criminal laws in Alabama. *See* Ala. Code § 12-17-184(2); § 36-15-14; *see also* § 36-15-21.

26

failed to successfully navigate a constitutionally defective process, the Attorney General and District Attorney act ultra vires under the logic of the *Ex parte Young* fiction—thus "some connection" exists.

So, much like *Summit*, the criminal-enforcement link here establishes the necessary connection between the defendants and the challenged provisions. The plaintiffs' failure to challenge the criminal-enforcement provision here presents no obstacle. The plaintiffs do not fear enforcement of a constitutional judicial-bypass procedure. They fear enforcement of an unconstitutional one. Therefore, the plaintiffs did not challenge the criminal enforcement provision because that provision is not the problem. To the extent that the bypass procedure is constitutional, criminal enforcement can proceed as imagined. But when the procedure is unconstitutional, the defendants' enforcement would be ultra vires. Failure to challenge the criminal-enforcement provision does not change the fact that, under the amended bypass procedure, the Attorney General and District Attorney are authorized to criminally enforce allegedly unconstitutional procedures. This establishes "some connection," and that is all that *Ex parte Young* calls for.

Finally, because *Ex parte Young* is based on a legal fiction, it makes sense to consider the purpose the fiction serves. *See Parker v. Ellis*, 362 U.S. 574, 596 (1960) (Douglas, J., dissenting) ("The purpose of any fiction is to reconcile a specific legal result with some premise." (alteration adopted)). The plaintiffs in *Ex*

27

*parte Young* challenged a statute ordering fixed rates for railroad companies and subjecting those who failed to adopt the rates to criminal penalties. 209 U.S. at 127–29. They named Minnesota Attorney General Young as the defendant. *Id.* Young objected, arguing in part that because there was "a plain and adequate remedy at law open to the complainants, . . . [the Court] ha[d] no jurisdiction in such case." *Id.* at 163. Young asserted that "the proper way to test the constitutionality of the act is to disobey it, at least once, after which the company might obey the act pending subsequent proceedings to test its validity." *Id.*; *see also Fitts v. McGhee*, 172 U.S. 516, 530 (1898). The Court rejected this, explaining:

> To await proceedings against the company in a state court, grounded upon a disobedience of the act, and then, if necessary, obtain a review in [the Supreme Court] by writ of error to the highest state court, would place the company in peril of large loss and its agents in great risk of fines and imprisonment if it should be finally determined that the act was valid. This risk the company ought not to be required to take. . . . The courts having jurisdiction, Federal or state, should, at all times, be opened to them as well as to others, for the purpose of protecting their property and their legal rights.

*Ex parte Young*, 209 U.S. at 165.

*Ex parte Young* thus provides an avenue for a civil lawsuit so plaintiffs do not need to subject themselves to criminal prosecution to challenge unconstitutional laws. *See id.* at 147. That civil avenue is particularly important here, where the law

involves the inherently serious time-sensitive issue of minors' access to abortion and violating the law could cause medical professionals to lose their licenses.

Accordingly, we find that the doctrine of *Ex parte Young* applies here. The Attorney General and District Attorney are proper defendants.

## VI.    MERITS

We now address the plaintiffs' constitutional challenge to the Act. Like the district court, we conclude that the challenged provisions are unconstitutional because they present substantial obstacles (i.e., undue burdens) to a minor's right to an abortion.

### A. THE STANDARD WHEN BOTH PARTIES SEEK JUDGMENT ON THE PLEADING

The district court addressed the plaintiffs' constitutional challenges through the parties' cross-motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Our review is therefore de novo. *See Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

When both parties move for judgment under Rule 12(c), the district court must treat each motion as if the other had not been made and by that process determine whether any material issues of fact are presented by the pleadings. *See* 5C Charles A. Wright & Arthur Miller, *Federal Practice and Procedure* § 1370 (3d ed. 2004 & Supp. 2019); *Chagnon v. Town of Shrewsbury*, 901 F. Supp. 32, 35 (D. Mass. 1995).

Under Rule 12(c), the district court generally must accept as true the allegations in the pleadings of the non-moving party and draw all reasonable inferences in that party's favor. *See Perez*, 774 F.3d at 1335. That means that when a defendant moves for judgment on the pleadings, the court is required to take the factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See, e.g.*, *Mergens v. Dreyfoos*, 166 F.3d 1114, 1117 (11th Cir. 1999). When a plaintiff moves for judgment on the pleadings, the reverse is true— the court must consider the defendant's answer, and treat any factual allegations denied by the defendant as false. *See, e.g.*, *Beal v. Mo. Pac. R.R. Co.*, 312 U.S. 45, 51 (1941) (explaining that when a plaintiff moves for judgment on the pleadings, the "denials and allegations of the answer which are well pleaded must be taken as true").

When the district court considered the defendants' motion for judgment on the pleadings, it had to accept all the plaintiffs' factual allegations as true, but when it considered the plaintiffs' motion, it had to reject the plaintiffs' factual allegations. This led to a pleadings détente: there were no factual allegations that the court could consider, because the defendants did not allege any specific facts in their answer.

The absence of facts was not necessarily fatal to the plaintiffs' motion because the plaintiffs' constitutional challenges were facial in nature. "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los*

*Angeles v. Patel*, 135 S. Ct. 2443, 2449 (2015). And "[i]n a facial challenge . . . the facts of the challenging party's case are irrelevant." *Miami Herald Publ'g Co. v. City of Hallandale*, 734 F.2d 666, 674 n.4 (11th Cir. 1984). In their statement of facts, the Attorney General and District Attorney cite to certain declarations they submitted in opposition to the plaintiffs' motion for a preliminary injunction. Given the posture of this case, we cannot consider these declarations because they constitute evidence outside of the pleadings.

## B. FACIAL CHALLENGES AND THE UNDUE BURDEN STANDARD

The Supreme Court has said that a plaintiff can succeed on a facial constitutional challenge to a statute only by showing that "no set of circumstances exist under which the [law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), but that rule does not apply with full force in the abortion context. In *Ohio v. Akron Center for Reproductive Health* (*Akron II*), 497 U.S. 502 (1990), the Court used the "no set of circumstances" standard to analyze a facial challenge to an Ohio judicial-bypass statute. In the years since, however, the Court has repeatedly held that an abortion regulation is invalid if it creates an "undue burden." *Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 877 (1992).

A law creates an undue burden if "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Id.* at 895. A court must consider "the burdens a law imposes

31

on abortion access together with the benefits those laws confer." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016). *Whole Woman's Health* recites the binding standard that we must apply here, and the Supreme Court's recent decision in *June Medical Services, L.L.C. v. Russo*, 140 S. Ct. 2103 (2020), did not change that. [6]

### C. PARENTAL CONSENT/NOTICE REQUIREMENTS & JUDICIAL BYPASS

---

[6] Last Term, in a splintered 4-1-4 decision in *June Medical Services*, the Court struck down a Louisiana abortion statute nearly identical to the challenged statute in *Whole Woman's Health*. The plurality's application of the benefits versus burdens balancing from *Whole Woman's Health* only garnered four votes. Chief Justice Roberts, the fifth vote for the majority, concurred in the judgment but wrote separately to stress that "the undue burden standard announced in *Casey* provides the appropriate framework to analyze" the challenged law. *See June Med. Servs.*, 140 S. Ct. at 2135 (Roberts, C.J., concurring in the judgment). He and the four dissenters expressly rejected the benefits-burdens balancing standard. *See id.* at 2182 (Kavanaugh, J., dissenting) ("Today, five Members of the Court reject the *Whole Woman's Health* cost-benefit standard.").

Although five Justices disagreed with the balancing approach to the undue burden analysis, the Court has instructed that we determine the holding of split decisions like *June Medical Services* not by counting to five, but by looking to the "narrowest grounds" of agreement among the members of the Court *who concurred in the judgment. See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'"). So the Chief Justice–dissenters bloc did not carry the day and could not overrule *Whole Woman's Health*. *See King v. Palmer*, 950 F.2d 771, 783 (D.C. Cir. 1991) (en banc) (Silberman, J., concurring) ("[W]e do not think we are free to combine a dissent with a concurrence to form a *Marks* majority."). In *June Medical Services*, the Chief Justice and the dissenters' rejection of benefits-versus-burdens balancing did not resurrect some previous undue burden standard; because the dissenters disagreed with the plurality opinion across multiple axes—from lack of standing to a contrary view of the district court record to use of the wrong standard of review—it is not even clear what standard the dissenters and the Chief Justice would apply on a facial attack to an abortion regulation.

The Chief Justice's concurrence cannot fairly be considered narrower than the plurality opinion because, although they came to the same result, the Chief Justice and the plurality diverged on the reasoning supporting that result. As a result, the only common ground between the plurality and Chief Justice Roberts is in the shared conclusion that the Louisiana statute constituted an undue burden. *See King*, 950 F.2d at 781 (stating *Marks* is workable "only when one opinion is a logical subset of other, broader opinions"). The benefits-burdens approach to the undue burden analysis from *Whole Woman's Health* therefore continues to bind us.

"The Supreme Court has held that it is constitutionally impermissible for a state to place an absolute [parental] veto on a minor's abortion decision." *Miller*, 934 F.2d at 1475 (citing *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976)). If a state wants to require an unemancipated minor to obtain parental consent to secure an abortion, it must provide a judicial alternative to the consent requirement. *See Bellotti II*, 443 U.S. at 643, 647–48 (plurality opinion). A judicial-bypass option must also be available if a state requires that a minor notify both parents of her intent to obtain an abortion. *See Hodgson v. Minnesota*, 497 U.S. 417, 457–58 (1990) (plurality opinion); *id.* at 461 (O'Connor, J., concurring in part and concurring in the judgment).[7]

In parental consent jurisdictions like Alabama, "every minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents." *Bellotti II*, 443 U.S. at 647 (plurality opinion). If the minor "satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental notification or consent." *Id.* If the minor fails to make this showing, she "must be permitted to show that an abortion nevertheless would be in her best interest. If the court is persuaded that it is, the court must authorize the abortion." *Id.* at 647–48.

---

[7] The Supreme Court has indicated that a state may use an administrative bypass procedure instead of a judicial one, *see Bellotti II*, 443 U.S. at 643 n.22 (plurality opinion), but we use the term judicial bypass in this opinion because Alabama's bypass procedure is administered by courts.

We have said that a judicial-bypass procedure must "meet[] the strict standards" of *Bellotti II*. *See Miller*, 934 F.2d at 1475. Those four standards are as follows.

First, the procedure must allow the minor to show that she is sufficiently mature and has enough information to make her abortion decision, in consultation with her physician, regardless of her parents' wishes. *See Bellotti II*, 443 U.S. at 643 (plurality opinion). In this respect, a requirement that a minor notify a parent about the judicial-bypass procedure is unconstitutional because it imposes "an undue burden upon the exercise by minors of the right to seek an abortion." *Id.* at 646–47.

Second, even if she is unable to show that she is mature enough to make the abortion decision on her own, the minor must be allowed to show that the abortion would be in her best interest. *See id.* at 644. A bypass court cannot substitute its own views as to the propriety of an abortion if it finds that the procedure is in the minor's best interest. *See id.* at 649–50.

Third, the procedure must ensure the minor's anonymity. *See id.* at 644. Although "complete anonymity" is not "critical," the state must take "reasonable steps to prevent the public from learning of the minor's identity." *Akron II*, 497 U.S. at 513 (upholding, prior to *Casey*, an Ohio judicial-bypass statute that (a) prohibited the court from notifying the minor's parents, guardian, or custodian, (b) provided that hearings were to be conducted in a manner that would  preserve the minor's

anonymity, (c) mandated that all records would be kept confidential and would not be considered public records, and (d) required the minor to disclose her identity and list the name of one parent on the complaint form).

Fourth, courts must conduct the bypass procedure in an expeditious manner to give the minor an effective opportunity to obtain the abortion. *See id.* at 513 (citing *Bellotti II*, 443 U.S. at 644 (plurality opinion)).

## D. THE DISTRICT COURT'S RULING

The district court held the Act unconstitutional under *Whole Woman's Health* for several reasons. The court first explained that disclosure of the bypass proceeding to third parties like the District Attorney, a guardian ad litem for the fetus, any subpoenaed witness, or "any other person determined by the court who needs to know" compromises confidentiality and a minor's anonymity. *See RHS II*, 268 F. Supp. 3d at 1280. With respect to the benefits that the statute might offer, the court acknowledged the defendants' argument that the provisions allowing for the involvement or participation of third parties were meant to give bypass courts information and guidance in making their decisions. *See id.* at 1282. But the district court concluded that the Act did not purport to provide any guidance, assistance, or educational benefits to the minor. *See id.* It also explained that there was no indication that the previous judicial-bypass scheme—which had been in place for 27 years—was in any way deficient or prevented bypass courts from developing the

35

necessary evidence to make the *Bellotti II* findings on maturity and/or best interest or denying petitions that were legally and factually unsupported. *See id.* at 1282–84. The court noted that none of the other states that have bypass statutes "permit[] participation by a parent or guardian, the DA, a GAL for the fetus, or witnesses (other than those called by the minor) in bypass proceedings for the purpose of providing the court with assistance in arriving at informed and proper decisions—or indeed for any other purpose." *Id.* at 1285. And it further noted that some states actually "affirmatively [] prohibit participation by parties other than the minor and her representatives." *Id.* Thus the court said that it would "strain credulity" to believe that no other bypass courts in the country could carry out their duties, make informed decisions, and do substantial justice without the presence of third parties like the guardian ad litem for the fetus or the District Attorney. *See id.* at 1285–86. The state's interest in ensuring that bypass courts would have the necessary evidence and information would be served without the participation of these third parties. *See id.*

The district court also noted the state's stated interest in having a constitutional judicial-bypass procedure, *see* § 26-21-1(c), (f), but concluded that the presence of the District Attorney and other third parties in the bypass proceeding did not advance this interest. *See RHS II*, 268 F. Supp. 3d at 1287–88. And even if the participation of the third parties furthered a valid state interest, provisions like § 26-21-4(i) had

36

the effect of placing a substantial obstacle in the path of the affected minor's choice, and therefore did not pass constitutional muster. *See id.* at 1288.

### E. ANALYSIS

We agree with the district court that the Act constitutes an undue burden because it places a substantial obstacle on a "large fraction" of unemancipated minors who seek to obtain a court order authorizing an abortion without the consent of their parent or guardian.[8]

### 1. BENEFITS AND BURDENS

*Whole Woman's Health* requires us to consider both the benefits and burdens of the challenged abortion regulation. 136 S. Ct. at 2309. We discuss the benefits first, and then turn to the burdens. When doing so, we keep in mind that the point of a bypass procedure is to allow the minor "to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physicians, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests." *Bellotti II*, 433 U.S. at 643–44 (plurality opinion); *see also Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1462 (8th Cir. 1995) (explaining that the "whole point of a bypass procedure is to allow the minor to show

---

[8] We review the constitutionality of a statute de novo. *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).

that the State's justification for requiring parental notice [or consent]—that minors are immature and in need of guidance for their own best interests—does not apply to her, either because she is mature or because an abortion is actually in her best interest").

### a. Benefits

In their brief, the Attorney General and the District Attorney assert two benefits.  First, the Act furthers the important state interest of providing bypass courts with "sufficient evidence and information upon which they may make informed and proper decisions."  They argue that the purpose of a bypass proceeding is to enable a court to make a factual finding of maturity or best interest, and "procedures that increase the quantity and quality of the evidence presented lead to a better and more thoughtful resolution."  In their view, the Alabama Legislature "reasonably concluded that an ex parte hearing with the testimony of a single witness adduced by a single lawyer may not always be the best format for reaching a factual determination."  Second, the Act advances the goal of "facilitat[ing] the provision of 'guidance and assistance'" to the minors contemplating an abortion.

However, the Attorney General and the District Attorney have not explained (in the district court or on appeal) how the challenged provisions "offer pregnant minors any kind of guidance or assistance." *RHS II*, 268 F. Supp. 3d at 1282.  Like the district court, we do not see how these provisions "might be designed to serve

the Legislature's goal of 'provid[ing] guidance and assistance to minors who find themselves in the unfortunate position of having to make [an abortion] decision.'" *Id.* (quoting § 26-21-1(f)).

Furthermore, as the district court explained, there is no indication that the prior judicial-bypass procedures—which were in place for over 20 years—were deficient or led to uninformed bypass decisions. *See id.* at 1283. For example, in cases where the bypass court determines that it needs more evidence to make an informed decision, it can adjourn the hearing or extend the time for ruling on a petition, provided it makes a finding that additional evidence is necessary. *See* § 26-21-4(e) & (f). And the bypass court is free to reject a minor's undisputed or unrebutted testimony. *See Ex parte Anonymous*, 803 So. 2d 542, 546 (Ala. 2001). Indeed, there are a number of published cases affirming the rulings of bypass courts which found, in ex parte scenarios, that minors were not sufficiently mature to make a decision about having an abortion or that an abortion was not in the minor's best interest. *See, e.g., Ex parte Anonymous*, 889 So. 2d 525, 525–26 (Ala. 2003); *In re Anonymous*, 812 So. 2d 1234, 1238–39 (Ala. 2001); *Ex parte Anonymous*, 808 So. 2d 1030, 1034 (Ala. 2001); *Ex parte Anonymous*, 806 So. 2d 1269, 1279 (Ala. 2001). Thus we see no problem that the new law helps to cure.

We find that the benefit from the participation of additional parties (like the District Attorney, the minor's parents, or a guardian ad litem for the fetus) under Alabama's amended procedures is incremental at best.[9]

### b. Burdens

On, then, to the burdens.  For an unemancipated minor who decides to avail herself of the bypass process, the challenged provisions present a substantial obstacle.  The challenged provisions fail to "meet[] the strict standards of *Bellotti* [*II*]." *Miller*, 934 F.3d at 1475.  And they will, we believe, "prevent some minors from even seeking [a] bypass in the first place." *See Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 983 (7th Cir. 2019).

### i. Involvement of the District Attorney

We start by focusing on the provision that allows the District Attorney to participate in the proceedings, § 26-21-4(i).  The Attorney General and the District Attorney argue that the District Attorney "serve[s] as an officer of the court" whose role is not to oppose the minor's petition.  We find it plausible that the District Attorney will at times act as a neutral facilitator, but there is no guarantee that he will always have such a limited and passive role.  After all, the Act does not just make the District Attorney a party to the proceeding, but instead provides that he

---

[9] We do so without deciding today whether *Bellotti II* and its progeny require bypass proceedings to be ex parte.

"*shall participate as an advocate for the state* to examine the petitioner and any witnesses, and to present evidence for the purpose of providing the court with a sufficient record upon which to make an informed decision and to do substantial justice." § 26-21-4(i) (emphasis added).

Under Alabama law, words are "given their natural, ordinary, commonly understood meaning, and where plain language is used, the court is bound to interpret that language to mean exactly what it says." *Ex parte Fletcher*, 718 So. 2d 1132, 1134 (Ala. 1998). An "advocate" is inherently not neutral, for he is one who supports a particular person or cause. *See* Pocket Oxford English Dictionary 13 (10th ed. 2005) ("a person who publicly supports or recommends a particular cause or policy," or a "person who pleads a case on someone else's behalf"); The American Heritage Dictionary of the English Language 26 (4th ed. 2009) ("[o]ne that argues for a cause"); Black's Law Dictionary 66 (10th ed. 2014) ("[s]omeone who assists, defends, pleads, or prosecutes for another"). Thus, we can expect that the District Attorney will oppose a minor's petition in most instances, turning the judicial-bypass proceeding into an adversarial one.

First, this adversarial proceeding conflicts with the purpose of judicial-bypass proceedings. The sole focus of a judicial-bypass hearing is on resolving the minor's maturity and best interest. *Bellotti II*, 443 U.S. at 644 (plurality opinion); *see also Zbaraz v. Hartigan*, 776 F. Supp. 375, 383 (N.D. Ill. 1991) ("No interests are

41

properly relevant to [judicial-bypass] proceedings except those of the pregnant minor."). A proceeding where the interests of another party come into play is inconsistent with that purpose. *See id.* at 382 (N.D. Ill. 1991) ("The *Bellotti II* plurality, in mandating that a pregnant minor should be given an alternative procedure to seeking parental approval prior to having an abortion, apparently did not contemplate that such a procedure would be a formal adversarial proceeding. Nor would an adversary proceeding be consistent with the purpose or nature of the hearing." (citation omitted) (citing *Bellotti II*, 443 U.S. at 643 n.22 (plurality opinion))). A statute "cannot constitutionally permit judicial disregard of the abortion decision of a minor who has been determined to be mature and fully competent to assess the implications of the choice she has made." *Bellotti II*, 443 U.S. at 650 (plurality opinion). Injecting the state's interests via the District Attorney defies this by allowing the district court to reach a decision "not based *exclusively* on what would serve the minor's best interests." *Id.* at 644 (emphasis added).

Further, we cannot ignore the very real possibility that an unemancipated minor who seeks a judicial bypass—particularly one without counsel—may reasonably believe, based on the text of § 26-21-4(i), that the District Attorney may be a foe. This creates an undue burden in the sense that it will "prevent some minors from even seeking [a] bypass in the first place." *Adams*, 937 F.3d at 983. Even if

42

the District Attorney conducts himself as a neutral facilitator "protect[ing] the process," the prospect of facing cross-examination by an adverse party can create more fear and anxiety for a minor. Indeed, even when minors are not subject to cross-examination, "[d]espite assurances of their attorneys, they anticipate being brutally cross examined about the intimate details of their life." J. Shoshanna Ehrlich and Jamie Ann Sabino, *A Minor's Right to Abortion—The Unconstitutionality of Parental Participation in Bypass Hearings*, 25 New Eng. L. Rev. 1185, 1207 (1991).

If such cross-examination is a reality, and if their attorneys cannot assure them otherwise, the resulting trauma will be exacerbated. *See id.* (one judge who "painfully recounted the anguish of young women who appeared before him [in bypass proceedings], noting, in particular, their monosyllabic responses, shaky voices and wringing of hands"). It has been observed: "[I]f abortion can't be made illegal, it can still be made to *feel* illegal." Carol Sanger, *Decisional Dignity: Teenage Abortion, Bypass Hearings, and the Misuse of Law*, 18 Colum. J. Gender & L. 409, 479 (2009). Because this will likely "prevent some minors from even seeking [a] bypass in the first place," *Adams*, 937 F.3d at 983, we find such involvement by the District Attorney poses a substantial obstacle to a minor seeking an abortion.

43

## ii. Involvement of Court-Appointed Guardians Ad Litem

Section 26-21-4(j), which gives courts discretion to appoint a guardian ad litem for the fetus, presents an even clearer burden on the rights of the minor than does the District Attorney's involvement. All of the burdens discussed above are present under this provision, as the guardian ad litem has "the same rights and obligations of participation in the proceeding as . . . the district attorney's office." § 26-21-4(j). Explained above, these new powers authorized under the provision create a constitutionally impermissible adversarial, trial-like proceeding. But this provision is even more burdensome because the guardian ad litem is appointed specifically to represent "the interests of the unborn child." *Id.* Unsurprisingly, the reported cases where such appointments were made demonstrate that the guardian ad litem will not hesitate to lobby against the minor's petition. *See, e.g.*, *Ex parte Anonymous*, 889 So. 2d 518, 518 (Ala. 2003) (per curiam) (the guardian for the fetus cross-examined the minor); *Ex parte Anonymous*, 810 So. 2d 786, 789 (Ala. 2001) (the guardian for the fetus "subjected [the minor] to a probing cross-examination"); *In re Anonymous*, 720 So. 2d 497, 499–500 (Ala. 1998) (per curiam) (the guardian for the fetus opposed the minor's bypass petition).

This provision provides the guardian ad litem with an arsenal of concrete tools to champion the interests of the fetus and to oppose the minor's petition on grounds other than the minor's maturity or best interest. The guardian ad litem can request

44

extensions of the time limit for the court to rule on the petition, present admissible evidence against the petition, request additional time to obtain and present evidence and to subpoena witnesses, and appeal the granting of a petition. *See* § 26-21-4 (e), (f), (k), (n). The legislature granted these powers notwithstanding the Alabama Supreme Court's statement that the legislature "could not constitutionally confer upon a nonviable fetus the right to appeal, through a guardian ad litem, an order granting a minor's request to have an abortion." *In re Anonymous*, 720 So. 2d at 500.

The burden imposed by adding the guardian ad litem to represent the fetus is fundamentally different than the burden imposed by adding a guardian ad litem to represent the minor, which we considered in *Miller*, 934 F.2d 1462. There, we upheld a Georgia law that provided for the appointment of a guardian for a minor in a bypass proceeding and for an initial screening of a bypass petition by a court intake officer. *Id.* at 1478 n.24, 1479–81. We reasoned that the guardian "always will conclude that it is in the minor's best interest to proceed with the [bypass] petition," and, as a result, the guardian's appointment "promote[s] rather than burden[s] the minor's abortion decision." *Id.* at 1481. The same cannot be said when the guardian ad litem is appointed to represent the best interest of the fetus. In fact, the opposite is true here: the guardian will conclude in most instances that it is in the fetus's best interest to pursue life. This adversarial process—where the minor and the guardian

45

ad litem will disagree—clearly burdens, rather than promotes, the minor's right to an abortion.

Last, by allowing a guardian ad litem to be made a party in this proceeding, the provision significantly erodes the confidentiality and anonymity that bypass proceedings demand. *See Akron II*, 497 U.S. at 513 (explaining that states must take "reasonable steps to prevent the public from learning of the minor's identity" in regulating judicial-bypass proceedings). The appointment of the guardian ad litem is particularly problematic in this regard because—as we noted above—he or she has the power to subpoena other parties. This is distinguishable from *Miller*, where the only parties that could learn of the minor's identity (without the minor's consent) were a court intake officer and a guardian appointed to serve the minor's best interest. We therefore find that the appointment of a guardian ad litem to represent the fetus's interests creates an undue burden on unemancipated minors who seek to obtain a court order authorizing an abortion without the consent of parents or guardians.

### iii. Involvement of Parents or Guardians

The inclusion of the minor's parents or guardians in the proceeding (if they otherwise become aware of it) similarly and significantly burdens the minor's right to terminate her pregnancy. We begin by noting the general principle that "[t]he Constitution protects all individuals, male or female, married or unmarried, from the

abuse of governmental power, even where that power is employed for the supposed benefit of a member of the individual's family." *Casey*, 505 U.S. at 898. And these "[c]onstitutional [protections and] rights do not mature and come into being magically only when one attains the state-defined age of majority." *Danforth*, 428 U.S. at 74.

The Court in *Bellotti II* set a limited role for parents in a bypass proceeding, acknowledging that "many parents hold strong views on the subject of abortion, and young pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct both an abortion and their access to court." *See* 443 U.S. at 647 (plurality opinion). Even as it recognized the importance of state deference to parental control over children, the Court restricted the parents' role to one of providing consultation when it is found to be in the minor's best interest. *Id.* at 648. "But this is the full extent to which parental involvement may be required." *Id.* The Act—which gives the parents or guardians the same "rights and obligations of any party to the proceeding," § 26-21-4(*l*)—allows far more than mere consultation; it opens the door for parents to cross-examine their minor child in court, obtain evidence that they were not otherwise privy to, and submit that evidence in opposition to their child's petition. *See* § 26-21-4(e), (f), (k), (n).

Further, even if a minor's parents or guardians are not notified about the petition, their ability to participate fully as parties under the Act makes the

47

protections of *Bellotti II* a mirage. The purpose behind the judicial bypass is to provide a judicial alternative to the parental consent requirement. "[E]very minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents." *Bellotti II*, 443 U.S. at 647 (plurality opinion). Effectively eliminating this opportunity—given courts' tendency to defer to parents' best judgment about their children's lives, *see id.* at 637—defeats the purpose of *Bellotti II* and constitutes an undue burden.

### iv. Confidentiality

Finally, we consider the confidentiality implications of the Act. The challenged portions of § 26-21-4(c) permit the identity of the minor to be disclosed to a representative for the District Attorney, a guardian ad litem, and the witnesses and persons whom the bypass court determines have a need to know. Section 26-21-4(f) allows the parties to the bypass proceedings to subpoena witnesses and present testimony and evidence. Section 26-21-4(k) allows any party to obtain evidence and subpoena witnesses. And § 26-21-4(e) and (n) permit parties other than the minor to take actions related to the bypass proceedings.

A minor petitioning a bypass court is entitled to a proceeding that "will be completed with anonymity." *Bellotti II*, 443 U.S. at 644 (plurality opinion). Thus states are required to take "reasonable steps to prevent the public from learning of the minor's identity." *Akron II*, 497 U.S. at 513. The challenged provisions are

inconsistent with the confidentiality requirement, and therefore constitutionally impermissible.

True, *Miller* allows "limited disclosure" of the minor's name to the guardian ad litem and to the court's intake officer. *Miller*, 934 F.2d at 1478 n.24. But the Act goes much further by requiring notice to the District Attorney, allowing parents and a guardian ad litem for the fetus to be made parties, and including other witnesses and persons. To make matters worse, in the case of the District Attorney the notification will almost certainly extend beyond him to members and employees of his office who are assisting him. By significantly expanding disclosures, the Act erodes the confidentiality and anonymity that bypass proceedings demand.

Moreover, those who are subpoenaed to provide testimony or turn over documents will learn of the minor's identity and petition. And witnesses who can testify about the minor's maturity and best interest—those who know the minor and are familiar with her situation—may be the very people to whom the minor does not want to disclose her predicament.

To be sure, a state must only take "reasonable steps" to ensure a minor's confidentiality. *Akron II*, 497 U.S. at 513. The "mere possibility of unauthorized, illegal disclosures" cannot render the judicial-bypass procedure unconstitutional. *Id*. But here, the Act itself authorizes confidentiality violations. These challenged provisions are unconstitutional in that they fail to adequately ensure anonymity.

49

* * *

A "statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2309. Though the state has an interest in providing guidance and assistance to minors who seek an abortion without parental consent, the challenged provisions provide, if anything, marginal benefit. We find that the provisions create substantial obstacles and are therefore "[im]permissible means" of serving "legitimate ends." *Id.* We now turn to whether the burden constitutes a substantial obstacle for a "large fraction" of affected minors.[10]

---

[10] As we have explained, we are bound to "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309. Wary of the controversy in the ranks of the Supreme Court surrounding the use of that benefits-versus-burdens approach, we pause briefly to consider whether the Act creates an undue burden even without weighing its benefits, and conclude that it does.

For all the reasons we have already elaborated upon, the Act substantially burdens a minor's right to terminate her pregnancy. It does so principally by compromising the minor's anonymity in violation of *Bellotti II*—by allowing and sometimes mandating the participation of additional parties, by those parties' ability to subpoena witnesses and further expand the circle of people who know of the minor's petition, and by the inevitable disclosures to the members of the District Attorney's office that occur when he is made a required party. That their participation also shifts the bypass proceeding's traditional function and focus—which is to allow minors to show that the State's justifications for requiring notice or consent are inapplicable to her, *see Bellotti II*, 443 U.S. at 647–48 (plurality opinion)—only reinforces our ultimate conclusion.

Despite this analysis (applying Chief Justice Roberts' approach in *June Medical Services*), we note Justice Gorsuch's observation that the Chief Justice's concurrence fashioned "a new test of its own creation"—one that did not appear in *Whole Woman's Health*. *See June Med. Servs.*, 140 S. Ct. at 2181 (Gorsuch, J., dissenting). According to Justice Gorsuch, *Whole Woman's Health* insisted on considering the benefits. *See id.*

However much we may sense a growing appetite to overturn or refine the legal standard for facial attacks in the abortion context, we remain bound by *Whole Woman's Health*. We address

## 2. FIGURING OUT THE "LARGE FRACTION"

*Whole Woman's Health* and *Casey* require us to determine the denominator of the "large fraction" by determining the number of women affected by the Act. *See Whole Woman's Health*, 136 S. Ct. at 2320; *Casey*, 505 U.S. at 895. Here, that universe consists of unemancipated minors in Alabama who seek to have an abortion without parental consent, through a judicial-bypass proceeding. *See Adams*, 937 F.3d at 982–83 (holding that the denominator under *Casey* is the "unemancipated minors seeking bypasses" because the provision's "restriction is relevant" for those young women; and explaining that the numbers for the numerator and the denominator may be larger to account for women who were likely to be deterred from even attempting judicial bypass because of the challenged provision); *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 370 (6th Cir. 2006) (holding that the denominator under *Casey* is the "women who are denied a bypass and who have changed circumstances such that if they were able to reapply for a bypass, it would be granted").

Alabama's health records indicate that this universe is, numerically speaking, a small one. Each year, the Alabama Center for Health Statistics, a division of the Alabama Department of Public Health, publishes statistics about abortions in

---

the Chief Justice's standard only to further demonstrate our certainty that the Act is unconstitutional, and not to predict the applicable legal standard of tomorrow.

Alabama, and those statistics indicate the following.  In 2012, minors had 461 abortions, only 5 of which were through court order; in 2013, minors had 344 abortions, only 5 of which were through court order; in 2014, minors had 329 abortions, only 9 of which were through court order; in 2015, minors had 205 abortions, and none of them were through court order; in 2016, minors had 254 abortions, only 2 of which were through court order; in 2017, minors had 199 abortions, only 4 of which were through court order; and in 2018 minors had 229 abortions, only 3 of which were through court order.  So, for this seven-year period from 2012 to 2018—both before and after the 2014 amendments to the Parental Consent Act—minors obtained a judicial bypass for an abortion 28 times, or an average of four per year.  As a percentage of abortions obtained by minors, those secured through a court order were 1.385% of the total (28 / 2,021).[11]

The number of minors who sought a court order for an abortion in some of those years might be slightly higher, for we do not know with certainty how many minors might have requested, and been denied, a judicial bypass.  Although there is one reported case in Alabama denying a judicial bypass during this seven-year

---

[11] We take judicial notice of these statistics under Federal Rule of Evidence 201(b)(2).  *See, e.g.*, *Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015) (taking judicial notice of the number of colonels, and the number of prisons in which they were stationed, in the Florida Department of Corrections based on the Department's annual report); *Terrebone v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports.").  Copies of the relevant pages from the reports of the Alabama Center for Health Statistics are attached as an appendix.

period, *see Ex parte Anonymous*, 92 So. 3d 68, 69 (Ala. 2012) (Parker, J., concurring specially), we cannot say with confidence that there are (or are not) more cases in which a bypass was denied at the trial court and or appellate levels. And we do not know whether any minors were deterred from seeking a judicial bypass by operation of the Act from 2014—when the Act was amended—until 2017—when the district court issued its opinion. *See Adams*, 937 F.3d at 982–83 (indicating that a denominator based on number of minors seeking bypasses could be larger to include the number of women likely to be deterred from seeking the bypass). Nevertheless, it appears to us that the total number of minors seeking a judicial bypass in Alabama on a yearly basis is relatively small.

Figuring out the numerator under *Whole Woman's Health* and *Casey* is no easy matter. The Supreme Court has not defined the term "large fraction," we have not confronted the issue, and other federal courts have adopted various approaches.

Courts that have sought mathematical precision in determining what constitutes a "large fraction" have disagreed on what satisfies the standard. The Fifth Circuit has held that 30% is not a "large fraction," while the Eighth Circuit has indicated that 18% is a "large fraction." *Compare June Med. Servs. L.L.C. v. Gee*, 905 F.3d 787, 815 (5th Cir. 2018), *rev'd on other grounds*, 140 S. Ct. 35 (2019), *with Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1462 & n.10 (8th Cir. 1995).

53

To make matters more difficult, some courts have recognized that the "large fraction" test is, in some ways, "more conceptual than mathematical," while still requiring some arithmetical computations and boundaries. *See Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 960 (8th Cir. 2017); *see also Gee*, 905 F.3d at 831–32 (Higginbotham, J., dissenting) ("The 'large fraction' language does not require the court to engage in rote mathematical calculations but instead directs the court to focus its inquiry on those who will be actually restricted by the law and determine whether the law will operate as a substantial obstacle for that population." (footnote omitted)).

In a case involving a facial challenge on cross-motions for judgment on the pleadings, figuring out the "large fraction" is undoubtedly a predictive exercise. Fortunately, we do not need to categorically define the term "large fraction" for all cases involving abortion regulations. The Supreme Court did not engage in detailed mathematical analyses to figure out the numerator of the "large fraction" test in either *Casey*, 505 U.S. at 893–95 (relying on the "significant number" of women who would likely be prevented from obtaining an abortion due to a spousal notification requirement), or in *Whole Woman's Health*, 136 S. Ct. at 2311–14, 2316–18, 2320 (focusing on the number of abortion facilities which closed or did not qualify due to the challenged regulations). Even for those courts that look for some mathematical precision in ascertaining what constitutes a "large fraction,"

54

estimating the number of women in the affected group who would be unduly burdened by the regulation is permissible. *See Jegley*, 864 F.3d at 959–60 (faulting the district court in part for failing to "estimate the number of women" who would "forgo abortions" or "postpone their abortions" due to the challenged regulation, but stating that "[o]n remand, we do not require the district court to calculate the exact number of women unduly burdened by the contract-physician requirement").

Our "large fraction" denominator, again, consists of the number of unemancipated minors in Alabama who seek abortions through a judicial bypass. That number, on average, is roughly four a year—but perhaps several more, considering those who might have been deterred from seeking a bypass between 2014 and 2017. Given this small universe, even if we use a purely arithmetical calculation, there would still be a "large fraction" facing an undue burden if just three or four unemancipated minors would be adversely affected by Act's provisions in the bypass proceeding. We are confident that the Act as amended creates an undue burden under *Whole Woman's Health* by placing a substantial obstacle each year for a handful of unemancipated minors who would seek to obtain a judicial bypass from the parental/guardian consent requirements of the Act. For these minors, the Act would either (a) unduly interfere with their ability to demonstrate maturity or best interest by adding additional (and possibly adversarial parties) in the bypass proceeding, or (b) deter them from trying to obtain a court order through a judicial

bypass proceeding. We therefore affirm the district court's conclusion that the challenged provisions of the Act are unconstitutional.

## VII.   CONCLUSION

The district court correctly held that the Attorney General and the District Attorney are proper defendants under *Ex parte Young*. It also was right in holding that RHS had standing to challenge Alabama's Parental Consent Act. Because we agree with the district court that several provisions of the Act create an undue burden under *Whole Woman's Health* and *Casey*, we affirm.

**AFFIRMED.**

JORDAN, Circuit Judge, concurring.

The Supreme Court has told us that in cases not involving the First Amendment, a litigant mounting a facial challenge must typically show that there is "no set of circumstances" under which the law would be valid or that the law "lacks any 'plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 472 (2010) (citations omitted). In such cases, the "proper focus of the constitutional inquiry is [the conduct] that the law actually authorizes [or proscribes], not th[at] for which it is irrelevant." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2016).

Though it is unclear how broadly the "no set of circumstances" standard sweeps today, *see, e.g., Johnson v. United* States, 576 U.S. 591, 602-03 (2015) (declining to apply the "no set of circumstances" standard in a facial vagueness challenge to a criminal sentencing provision), the Supreme Court conducts a different facial invalidity analysis for abortion regulations—it asks whether the law in question, in purpose or effect, creates an undue burden (i.e., a substantial obstacle) in a large fraction of cases for women who have chosen to have an abortion. *See Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292, 2309-10, 2320 (2016); *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1317, 1326 (11th Cir. 2018). Applying that standard often requires a robust evidentiary record with detailed factual findings, *see, e.g., Whole Woman's Health*, 136 S.Ct. at 2301-03, and that sort of record is by definition absent when the parties file cross-motions for judgment

on the pleadings. As the majority correctly notes, in such a posture there are usually no factual allegations to be credited on either side of the case.

When both parties move for judgment under Rule 12(c), the district court must treat each motion as if the other had not been made and by that process determine whether any material issues of fact are presented by the pleadings. *See Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014); 5C Charles A. Wright & Arthur Miller, Federal Practice and Procedure, § 1370 (3d ed. 2004 & 2019 Supp); 2 Moore's Federal Practice, § 12.38 (3d ed. 2019). That means that when a defendant moves for judgment on the pleadings the court is required to take the factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See, e.g., Mergens v. Dreyfoos*, 166 F.3d 1114, 1117 (11th Cir. 1999). But when a plaintiff moves for judgment on the pleadings—an admittedly rarer occurrence—the reverse is true. In that scenario, the court must consider the defendant's answer, and if the defendant has denied any of the plaintiff's factual allegations, the court must treat those allegations as false. *See, e.g., Beal v. Mo. Pac. R.R. Co.*, 312 U.S. 45, 51 (1941) (explaining that when a plaintiff moves for judgment on the pleadings, the "denials and allegations of the answer which are well pleaded must be taken as true"); *Bass v. Hoagland*, 172 F.2d 205, 207 (5th Cir. 1949) ("On a motion for judgment on the pleadings [filed by the plaintiff] the old rule obtains that the fact allegations of the answer are to be taken as true, but those of the

58

complaint are taken as true only where and to the extent that they do not conflict with those of the answer."); 1 Richard A. Givens, Manual of Federal Practice, § 4.31 (4th ed. 1991) ("For purposes of a Rule 12(c) motion, all controverted allegations in the pleadings of the moving party are treated as false[.]").

For me, it is important that the Attorney General and the District Attorney do not contend that the district court committed procedural error by misapplying the judgment-on-the-pleadings standard. They do not argue, for example, that the proper merits resolution of this appeal is to conclude that there are material issues of fact and to remand the case for the development of a full evidentiary record at summary judgment or trial. Instead, they maintain that all of the challenged provisions are constitutional. *See* Br. for Appellants at 27-52.

The Attorney General and the District Attorney do make two passing references to an alternative request for a remand, but both are wholly conclusory. In their summary of the argument, they assert in the alternative that we should "remand so that a factual record may be developed," *id.* at 16, but they do not elaborate on or even mention that assertion in the 25 pages of argument that follows. The only time they return to their remand request is in the conclusion of their brief, where they repeat—again without explanation—that in the alternative we should reverse and remand "so that a factual record may be developed." *Id.* at 53. These fleeting sentences, bereft of argument or citations of authority, are insufficient. As

59

we have explained, "[a] passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives [or abandons] it." *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012). Indeed, we have held that a party waives or abandons an issue mentioned in the summary of the argument section of its brief by not developing or presenting arguments on that issue. *See Kelliher v. Veneman*, 313 F.3d 1270, 1274 n.3 (11th Cir. 2003).

"We normally decide cases and issues as framed by the parties," and the District Attorney and Attorney General "ha[ve] abandoned any procedural objections" to the district court's application of the judgment-on-the-pleadings standard "by not raising them in [their] brief." *PDVSA U.S. Litigation Trust v. Lukoil Pan Americas, LLC*, 991 F.3d 1187, 1192-93 (11th Cir. 2021). *See also Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). "In a case like this one—involving sophisticated litigants represented by able counsel—there is no reason to depart from the general principle of party presentation." *PDVSA*, 991 F.3d at 1193. The court therefore properly reaches the merits of the plaintiffs' constitutional claims, and I join its opinion.



# INDUCED TERMINATIONS OF PREGNANCY
## OCCURRING IN ALABAMA, 2012

**Note that these tables contain data for all induced terminations of pregnancy that occurred in Alabama. The women may have lived in Alabama or some other state.**

| Induced Terminations of Pregnancy by Probable Postfertilization Age (PPFA) | |
|---|---:|
| **Total** | **9,076** |
| 6 or Less | 5,220 |
| 7 | 839 |
| 8 | 704 |
| 9 | 640 |
| 10 | 447 |
| 11 | 337 |
| 12 | 247 |
| 13 | 166 |
| 14 | 138 |
| 15 | 109 |
| 16 | 55 |
| 17 | 77 |
| 18 | 55 |
| 19 | 8 |
| 20 | 2 |
| 21 | 1 |
| 22 | 1 |
| 23 | 0 |
| 24 | 0 |
| 25 | 0 |
| 26 or More | 0 |
| Not Stated | 30 |

USCA11 Case: 17-13561    Date Filed: 06/30/2021    Page: 61 of 74

USCA11 Case: 17-13561    Date Filed: 06/30/2021    Page: 62 of 74

## Induced Terminations of Pregnancy by Type of Consent
## for Women Under 18 Only

| Consent Requirement | | Type of Consent (only includes those required) | |
|---|---|---|---|
| Total | 461 | Total | 461 |
| Not Required | 0 | Parental | 454 |
| Required | 461 | Court Order | 5 |
| Not Stated | 0 | Medical Emergency | 1 |
| | | Not Stated | 1 |

## Procedure used to terminate the pregnancy

| | |
|---|---|
| Total | 9076 |
| Suction Curettage | 5808 |
| Sharp Curettage | 3 |
| Dilation and Evacuation (D&E) | 14 |
| Hysterotomy | 2 |
| Hysterectomy | 0 |
| Medication Abortion (such as mifepristone/misoprotol or methotrexate/misoprostol) | 2038 |
| Manual Vacuum Aspiration | 10 |
| Electrical Vacuum Aspiration | 1154 |
| Combined Induction Abortion and Dilation and Evacuation | 5 |
| Induction Abortion and Prostaglandins | 8 |
| Induction Abortion with Intra-Amniotic Instillation (such as saline or urea) | 0 |
| Induction Abortion – Other | 7 |
| Intact Dilation and Evacuation | 0 |
| Method Not Listed, Specify (Salpingectomy) | 22 |
| Not Stated | 5 |

## Was an intra-fetal injection used in an attempt to induce fetal demise (such as intra-fetal potassium chloride or digoxin)?

| | |
|---|---|
| Total | 9076 |
| Yes | 9 |
| No | 9067 |

USCA11 Case: 17-13561    Date Filed: 06/30/2021    Page: 63 of 74



# ALABAMA CENTER FOR HEALTH STATISTICS

## INDUCED TERMINATIONS OF PREGNANCY OCCURRING IN ALABAMA, 2013

**Note that these tables contain data for all induced terminations of pregnancy that occurred in Alabama.  The women may have lived in Alabama or some other state.**

### Induced Terminations of Pregnancy by Probable Postfertilization Age (PPFA)

| | |
|---|---:|
| **Total** | **8,485** |
| 6 or Less | 4,857 |
| 7 | 827 |
| 8 | 642 |
| 9 | 515 |
| 10 | 414 |
| 11 | 339 |
| 12 | 240 |
| 13 | 167 |
| 14 | 136 |
| 15 | 125 |
| 16 | 75 |
| 17 | 66 |
| 18 | 71 |
| 19 | 9 |
| 20 | 1 |
| 21 | 0 |
| 22 | 1 |
| 23 | 0 |
| 24 | 0 |
| 25 | 0 |
| 26 or More | 0 |
| Not Stated | 0 |

USCA11 Case: 17-13561    Date Filed: 06/30/2021    Page: 64 of 74

## Induced Terminations of Pregnancy by Type of Consent
## for Women Under 18 Only

| Consent Requirement | | Type of Consent (only includes those required) | |
|---|---|---|---|
| **Total** | **346** | **Total** | **344** |
| Not Required (married) | 2 | Parental | 338 |
| Required | 344 | Court Order | 5 |
| Not Stated | 0 | Medical Emergency | 0 |
| | | Not Stated | 1 |

## Procedure used to terminate the pregnancy

| | |
|---|---|
| **Total** | **8,485** |
| Suction Curettage | 5,311 |
| Sharp Curettage | 2 |
| Dilation and Evacuation (D&E) | 28 |
| Hysterotomy | 0 |
| Hysterectomy | 1 |
| Medication Abortion (such as mifepristone/misoprotol or methotrexate/misoprostol) | 2,186 |
| Manual Vacuum Aspiration | 1 |
| Electrical Vacuum Aspiration | 907 |
| Combined Induction Abortion and Dilation and Evacuation | 6 |
| Induction Abortion and Prostaglandins | 3 |
| Induction Abortion with Intra-Amniotic Instillation (such as saline or urea) | 0 |
| Induction Abortion – Other | 0 |
| Intact Dilation and Evacuation | 0 |
| Method Not Listed, Specify (Salpingectomy) | 1 |
| Not Stated | 39 |

## Was an intra-fetal injection used in an attempt to induce fetal demise (such as intra-fetal potassium chloride or digoxin)?

| | |
|---|---|
| **Total** | **8,485** |
| Yes | 2 |
| No | 8,483 |



# INDUCED TERMINATIONS OF PREGNANCY OCCURRING IN ALABAMA, 2014

**Note that these tables contain data for all induced terminations of pregnancy that occurred in Alabama. The women may have lived in Alabama or some other states.**

### Induced Terminations of Pregnancy by Probable Postfertilization Age (PPFA)

| | |
|---|---|
| **Total** | **8,080** |
| 6 or Less | 4623 |
| 7 | 818 |
| 8 | 650 |
| 9 | 489 |
| 10 | 387 |
| 11 | 313 |
| 12 | 233 |
| 13 | 174 |
| 14 | 116 |
| 15 | 91 |
| 16 | 71 |
| 17 | 62 |
| 18 | 47 |
| 19 | 3 |
| 20 | 1 |
| 21 | 0 |
| 22 | 2 |
| 23 | 0 |
| 24 | 0 |
| 25 | 0 |
| 26 or More | 0 |
| Not Stated | 0 |

USCA11 Case: 17-13561     Date Filed: 06/30/2021     Page: 66 of 74

# INDUCED TERMINATIONS OF PREGNANCY OCCURRING
# IN ALABAMA, 2014 (continued)

## Induced Terminations of Pregnancy by Type of Consent
## for Women Under 18 Only

| Consent Requirement | | Type of Consent (only includes those required) | |
|---|---|---|---|
| **Total** | **329** | **Total** | **329** |
| Not Required (married) | 0 | Parental | 319 |
| Required | 329 | Court Order | 9 |
| Not Stated | 0 | Medical Emergency | 0 |
| | | Not Stated | 1 |

## Procedure used to terminate the pregnancy

| | |
|---|---|
| **Total** | **8,080** |
| Suction Curettage | 5,469 |
| Sharp Curettage | 2 |
| Dilation and Evacuation (D&E) | 12 |
| Hysterotomy | 0 |
| Hysterectomy | 0 |
| Medication Abortion (such as mifepristone/misoprotol or methotrexate/misoprostol) | 2,003 |
| Manual Vacuum Aspiration | 8 |
| Electrical Vacuum Aspiration | 566 |
| Combined Induction Abortion and Dilation and Evacuation | 1 |
| Induction Abortion and Prostaglandins | 4 |
| Induction Abortion with Intra-Amniotic Instillation (such as saline or urea) | 0 |
| Induction Abortion – Other | 2 |
| Intact Dilation and Evacuation | 0 |
| Method Not Listed, Specify (Salpingectomy) | 0 |
| Not Stated | 13 |

## Was an intra-fetal injection used in an attempt to induce fetal demise (such as intra-fetal potassium chloride or digoxin)?

| | |
|---|---|
| **Total** | **8,080** |
| Yes | 22 |
| No | 8,058 |

December 9, 2015                                          Page 3 of 4

# INDUCED TERMINATION OF PREGNANCY STATISTICS

# 2015

*Vital Statistics*

data rate equation city registrar provider date county table reporting profile formula trend percent chart frequency age trend health department special services quality

registration quality chart percent reporting vital registrar county date rate age data trend city number state total state natality population data registrar profile equation mortality formula provider EBRS table zip age total EDRS date county reporting trend analysis statistical frequency quality equation population vital health department trend chart total date age



ALABAMA CENTER FOR HEALTH STATISTICS



ALABAMA PUBLIC HEALTH

USCA11 Case: 17-13561    Date Filed: 06/30/2021

# INDUCED TERMINATIONS OF PREGNANCY, OCCURRING IN ALABAMA, 2015 (continued)

## Induced Terminations of Pregnancy by Type of Consent for Women Under 18 Only

| Consent Requirement | | Type of Consent (only includes those required) | |
|---|---|---|---|
| **Total** | **205** | **Total** | **205** |
| Not Required (married) | 0 | Parental | 202 |
| Required | 203 | Court Order | 0 |
| Not Stated | 2 | Medical Emergency | 0 |
| | | Not Stated | 3 |

## Procedure used to terminate the pregnancy

| | |
|---|---|
| **Total** | **5,899** |
| Suction Curettage | 3,607 |
| Sharp Curettage | 2 |
| Dilation and Evacuation (D&E) | 7 |
| Hysterotomy | 0 |
| Hysterectomy | 0 |
| Medication Abortion (such as mifepristone/misoprotol or methotrexate/misoprostol) | 1,923 |
| Manual Vacuum Aspiration | 2 |
| Electrical Vacuum Aspiration | 351 |
| Combined Induction Abortion and Dilation and Evacuation | 0 |
| Induction Abortion and Prostaglandins | 2 |
| Induction Abortion with Intra-Amniotic Instillation (such as saline or urea) | 0 |
| Induction Abortion – Other | 3 |
| Intact Dilation and Evacuation | 0 |
| Method Not Listed, Specify (Artificial Rupture of Membrane) | 2 |
| Not Stated | 0 |

## Was an intra-fetal injection used in an attempt to induce fetal demise (such as intra-fetal potassium chloride or digoxin)?

| | |
|---|---|
| **Total** | **5,899** |
| Yes | 3 |
| No | 5,896 |

USCA11 Case: 17-13561    Date Filed: 06/30/2021    Page: 69 of 74

*Vital Statistics*



ALABAMA
CENTER FOR
HEALTH STATISTICS



ALABAMA
PUBLIC
HEALTH

# INDUCED TERMINATIONS OF PREGNANCY,
# OCCURRING IN ALABAMA, 2016 (continued)

Date Filed: 06/30/2021

USCA11 Case: 17-13561

## Induced Terminations of Pregnancy by Type of Consent
## for Women Under 18 Only

| Consent Requirement | | Type of Consent (only includes those required) | |
|---|---|---|---|
| Total | 254 | Total | 254 |
| Not Required (married) | 0 | Parental | 252 |
| Required | 254 | Court Order | 2 |
| Not Stated | 0 | Medical Emergency | 0 |
| | | Not Stated | 0 |

## Procedure used to terminate the pregnancy

| | |
|---|---|
| **Total** | **6,642** |
| Suction Curettage | 4,248 |
| Sharp Curettage | 9 |
| Dilation and Evacuation (D&E) | 89 |
| Hysterotomy | 0 |
| Hysterectomy | 0 |
| Medication Abortion (such as mifepristone/misoprotol or methotrexate/misoprostol) | 1,906 |
| Manual Vacuum Aspiration | 2 |
| Electrical Vacuum Aspiration | 366 |
| Combined Induction Abortion and Dilation and Evacuation | 14 |
| Induction Abortion and Prostaglandins | 4 |
| Induction Abortion with Intra-Amniotic Instillation (such as saline or urea) | 0 |
| Induction Abortion – Other | 2 |
| Intact Dilation and Evacuation | 0 |
| Method Not Listed, Specify (Artificial Rupture of Membrane, Augmentation with Pitocin After Spontaneous Rupture of Membrane ) | 2 |
| Not Stated | 0 |

## Was an intra-fetal injection used in an attempt to induce fetal demise (such as intra-fetal potassium chloride or digoxin)?

| | |
|---|---|
| **Total** | **6,642** |
| Yes | 2 |
| No | 6,640 |

USCA11 Case: 17-13561    Date Filed: 06/30/2021

# INDUCED TERMINATION OF PREGNANCY STATISTICS
# 2017

Vital Statistics



ALABAMA CENTER FOR HEALTH STATISTICS



ALABAMA PUBLIC HEALTH

## Induced Terminations of Pregnancy by Type of Consent
### for Women Under 18 Only

| Consent Requirement | | Type of Consent (Includes only those requiring consent) | |
|---|---|---|---|
| **Total** | **199** | **Total** | **199** |
| Not Required (Married) | 0 | Parental | 192 |
| Required | 199 | Court Order | 4 |
| Not Stated | 0 | Medical Emergency | 0 |
| | | Not Stated | 3 |

## Procedure Used to Terminate the Pregnancy

| | |
|---|---|
| **Total** | **6,063** |
| Suction Curettage | 3,891 |
| Sharp Curettage | 6 |
| Dilation and Evacuation (D&E) | 183 |
| Hysterotomy | 2 |
| Hysterectomy | 0 |
| Medication Abortion (such as mifepristone/misoprotol or methotrexate/misoprostol) | 1,759 |
| Manual Vacuum Aspiration | 5 |
| Electrical Vacuum Aspiration | 187 |
| Combined Induction Abortion and Dilation and Evacuation | 26 |
| Induction Abortion and Prostaglandins | 3 |
| Induction Abortion with Intra-Amniotic Instillation (such as saline or urea) | 1 |
| Induction Abortion – Other | 0 |
| Intact Dilation and Evacuation | 0 |
| Method Not Listed | 0 |
| Not Stated | 0 |

## Was an intra-fetal injection used in an attempt to induce fetal demise (such as intra-fetal potassium chloride or digoxin)?

| | |
|---|---|
| **Total** | **6,063** |
| Yes | 2 |
| No | 6,061 |

USCA11 Case: 17-13561    Date Filed: 06/30/2021    Page: 72 of 74

USCA11 Case: 17-13561    Date Filed: 06/30/2021

# INDUCED TERMINATION OF PREGNANCY STATISTICS

# 2018

data rate equation date city registrar provider county table reporting age profile registrar formula trendpercent chart frequency age trend health department special services quality

*Vital Statistics*

registration quality chart percent reporting vital registrar county date rate age data trend city number state total data state natality city population data registrar profile equation mortality formula EBRS table zip age total provider county EDRS date EBRS trend analysis reporting statistical frequency quality vital equation population health department trend chart total date age



ALABAMA
CENTER FOR
HEALTH STATISTICS



ALABAMA
PUBLIC
HEALTH

USCA11 Case: 17-13561    Date Filed: 06/30/2021

# INDUCED TERMINATIONS OF PREGNANCY
# OCCURRING IN ALABAMA, 2018 (Continued)

## Induced Terminations of Pregnancy by Type of Consent
## for Women Under 18

| Consent Requirement | | Type of Consent (Includes only those requiring consent) | |
|---|---|---|---|
| **Total** | **229** | **Total** | **229** |
| Not required (married) | 0 | Parental | 226 |
| Required | 229 | Court order | 3 |
| Not stated | 0 | Medical emergency | 0 |
| | | Not stated | 0 |

## Procedure Used to Terminate the Pregnancy

| | |
|---|---|
| **Total** | **6,484** |
| Suction curettage | 4,027 |
| Sharp curettage | 3 |
| Dilation and evacuation | 405 |
| Hysterotomy | 1 |
| Hysterectomy | 2 |
| Medication abortion (such as mifepristone/misoprostol or methotrexate/misoprostol) | 2,019 |
| Manual vacuum aspiration | 0 |
| Electrical vacuum aspiration | 12 |
| Combined induction abortion and dilation and evacuation | 7 |
| Induction abortion and prostaglandins | 2 |
| Induction abortion with intra-amniotic instillation (such as saline or urea) | 0 |
| Induction abortion - other | 2 |
| Intact dilation and evacuation | 0 |
| Method not listed, specify _____ | 0 |
| Not stated | 4 |

## Was an Intra-fetal Injection Used in an Attempt to Induce Fetal Demise
## (such as intra-fetal potassium chloride or digoxin)?

| | |
|---|---|
| **Total** | **6,484** |
| Yes | 1 |
| No | 6,483 |